

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-21-00107-CV

_____

IN THE INTEREST OF S.P., A CHILD

On Appeal from the County Court at Law No. 2
Gregg County, Texas
Trial Court No. 2020-1949-CCL2

Before Morriss, C.J., Stevens and Carter,* JJ.
Memorandum Opinion by Chief Justice Morriss

_____

*Jack Carter, Justice, Retired, Sitting by Assignment

MEMORANDUM OPINION

The Department of Family and Protective Services (Department) brought a petition for protection of a child, for conservatorship, and for termination of Father's parental rights[1] to two-year-old S.P.[2] Following a bench trial, the trial court found that termination of the parent-child relationship was in S.P.'s best interest, and it terminated Father's parental rights pursuant to Section 161.001(b)(1), grounds (D) and (E).[3] *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(D), (E) (Supp.). Father's appeal challenges the legal and factual sufficiency of the evidence as to the statutory grounds for termination.[4] Because we conclude that the grounds for termination are supported by clear and convincing evidence, we affirm the trial court's judgment.

*Applicable Law and Standard of Review*

"The natural right existing between parents and their children is of constitutional dimensions." *In re E.J.Z.*, 547 S.W.3d 339, 343 (Tex. App.—Texarkana 2018, no pet.) (quoting *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). "Indeed, parents have a fundamental right to make decisions concerning 'the care, custody, and control of their children.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at

---

[1]Mother's rights were also terminated, but she did not appeal the trial court's order of termination.

[2]To protect the child's privacy, we refer to appellant as Father and to the child by initials. *See* TEX. R. APP. P. 9.8(b)(2).

[3]Father submits his challenges to the trial court's termination order in two points of error. However, because Section 161.001(b)(1), grounds (D) and (E), are interrelated, we have consolidated the two points of error in our discussion.

[4]Father does not challenge the trial court's finding that termination of his parental rights was in S.P.'s best interest.

2

trial." *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014)). "'Clear and convincing evidence' is that 'degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id.* (quoting TEX. FAM. CODE ANN. § 101.007) (citing *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009)). Based on this standard, we are required to "engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights." *Id.* (quoting *In re A.B.*, 437 S.W.3d at 500).

Yet, "[d]espite the profound constitutional interests at stake in a proceeding to terminate parental rights, 'the rights of natural parents are not absolute; protection of the child is paramount.'" *Id.* at 344 (quoting *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003)). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *Id.* (quoting *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.)).

"In our legal sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder reasonably could have formed a firm belief or conviction that the grounds for termination were proven." *In re L.E.S.*, 471 S.W.3d 915, 920 (Tex. App.—Texarkana 2015, no pet.) (citing *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.)). "We assume the trial court, acting as fact-finder, resolved disputed facts in favor of the finding, if a reasonable fact-finder could do so, and disregarded evidence that the fact-finder could have reasonably disbelieved or the credibility of which reasonably could be doubted." *Id.* (citing *In re J.P.B.*, 180 S.W.3d at 573).

3

"In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing." *Id.* (citing *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam)). "We consider only that evidence the fact-finder reasonably could have found to be clear and convincing and determine 'whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . . allegations.'" *Id.* (quoting *In re H.R.M.*, 209 S.W.3d at 109 (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002))) (citing *In re J.F.C.*, 96 S.W.3d 256, 264, 266 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266).

"Only one predicate finding under Section 161.001[b](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied) (quoting *In re A.V.*, 113 S.W.3d at 362) (citing *In re K.W.*, 335 S.W.3d 767, 769 (Tex. App.—Texarkana 2011, no pet.)). Yet, because the trial court's finding under grounds D and E "may have implications for . . . parental rights to other children," due process demands that we review the trial court's findings under these grounds. *In re N.G.*, 577 S.W.3d 230, 234 (Tex. 2019) (per curiam).

*Sufficient Evidence Supports Termination Under Grounds D and E*

When the record demonstrates clear and convincing evidence that a parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child," termination is proper on ground D. TEX. FAM. CODE ANN. § 161.001(b)(1)(D). "A child is endangered when the environment creates a potential for danger that the parent is aware of, but disregards." *In re N.B.*, No. 06-12-00007-CV, 2012 WL 1605457, at *9 (Tex. App.—Texarkana May 8, 2012, no pet.) (mem. op.). "'Environment' refers to the acceptability of the child's living conditions and a parent's conduct in the home." *In re D.A.B.*, No. 04-19-00629-CV, 2020 WL 1036433, at *3 (Tex. App.—San Antonio Mar. 4, 2020, no pet.) (mem. op.). "[S]ubsection (D) permits termination [of parental rights] based on a single act or omission [by the parent]." *In re L.C.*, 145 S.W.3d 790, 797 (Tex. App.—Texarkana 2004, no pet.); *see In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied). "Inappropriate, abusive, or unlawful conduct by a parent . . . can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection (D)." *In re R.W.*, 627 S.W.3d 501, 511 (Tex. App.—Texarkana 2021, no pet.). "Endanger" means, for purposes of grounds D and E, "to expose to loss or injury; to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *see In re L.E.S.*, 471 S.W.3d at 923.

Termination is permitted on ground E when there is clear and convincing evidence that the parent "engaged in conduct . . . which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). "It is not necessary that the conduct be

5

directed at the child or that the child actually suffer injury." *L.E.S.*, 471 S.W.3d at 923. "Under subsection (E), it is sufficient that the child's well-being is jeopardized or exposed to loss or injury." *Id.* (citing *Boyd*, 727 S.W.2d at 533; *In re N.S.G.*, 235 S.W.3d at 367). "Further, termination under subsection (E) must be based on more than a single act or omission. Instead, a "voluntary, deliberate, and conscious course of conduct by the parent is required.'" *Id.* (quoting *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.) (citing *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.))). Courts may further consider parental conduct that did not occur in the child's presence, including conduct before the child's birth or after the child was removed from a parent's care. *Walker v. Tex. Dep't Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Because they are interrelated, we consolidate our examination of grounds D and E.

Kimberly DeGrasse, an investigator with the Department, testified that she was the investigator assigned to S.P.'s case, which also involved two other children, Z.B. and E.P.[5] Initially, DeGrasse received a report concerning the physical abuse of E.P. after E.P. had been taken to the emergency room by Father. DeGrasse said that she arrived at the hospital around 1:00 a.m., when she learned that E.P. was going to be airlifted to Children's Hospital in Dallas. But before E.P. was airlifted, DeGrasse was able to take photographs of E.P., who had "noticeable marks and bruises to his face" and "a small bruise in the inside of his ear." E.P. also had an abrasion on his left cheek, bruising on his right eye, and dried blood on his lower lip.

---

[5]DeGrasse recalled that at the time of the investigation, Z.B. was seven years old, S.P. was eighteen months old, and E.P. was eight months old. This appeal involves the termination of Father's parental rights to S.P.

DeGrasse conceded that an eight-month-old child might get bruises and bumps while learning to walk. But she did not believe that E.P.'s injuries were caused in that manner, stating, "[T]he marks and bruises that I observed on his head and face were consistent with physical abuse."

Although DeGrasse was not able to speak to Father at the hospital, she did have the opportunity to speak to detectives who had spoken to Father. DeGrasse was told by detectives that Father had been the only parent with the children the night of the incident. According to the detectives, Father told them "that he had tripped and fallen over a boot, and that he blacked out at some point and he wasn't really sure what had happened." The detectives also told DeGrasse that there had been several inconsistencies in Father's story and that those inconsistencies caused her to be concerned. Yet, Father told the emergency room staff that "he had -- was falling and tossed [E.P.] up onto the bed, and [E.P.] -- [E.P.] must have rolled off his bed and that would be how he sustained the injury."

In addition, E.P.'s mother (Mother) told DeGrasse that on her way home from eating dinner with a friend, she received a phone call from Father informing her that E.P. was having a difficult time breathing and that he could not support his head. According to DeGrasse, the incident resulting in E.P.'s injuries occurred around 7:30 p.m., but Father did not take E.P. to the hospital until around 9:30 p.m. There was also evidence that Father did not take E.P. to the nearest hospital. On October 26, 2020, after the decision had been made to remove him from life support, E.P. passed away.

Suzanne Dakil, M.D., who is board certified in child abuse pediatrics, testified that she saw E.P. while he was in the pediatric intensive care unit on October 24, 2020. According to

7

Dakil, E.P. arrived at the hospital unresponsive. Dakil immediately set out to understand the events leading up to E.P.'s injuries. Initially, Dakil spoke with Mother on the telephone. Mother explained to Dakil that Father contacted her by telephone and told her "something was wrong with [E.P.]" Dakil stated, "[Mother's] understanding of what had happened was that Father had been carrying [E.P.] and had fallen potentially tripped over something that was on the floor and fallen while carrying [E.P.]; and that was the extent of what she knew." Dakil testified that her initial medical assessment for E.P. "was that he had significant brain swelling and subdural hemorrhage associated with trauma. The severity of his trauma was not consistent with a simple fall, even from an adult's height, and [she] was highly concerned for child abuse." Dakil stated that, after E.P. arrived at the hospital, the hospital staff did a CT scan of his brain. Explaining E.P.'s injuries, Dakil stated, "He had what we would say is global cerebral edema, meaning the entire brain was enormously swollen, which can lead to irreversible brain damage." According to Dakil, E.P. was not responsive and was not breathing on his own. She said that the ultimate cause of E.P.'s death was that "[t]he brain swelling ultimately resulted in his inability -- to live without massive amounts of support. And if I remember correctly, ultimately, he was brain dead." Dakil stated that what had been reported as causing E.P.'s injuries did not match the child's injuries, and that based on her training and experience, his injuries were more likely to have been caused by "[s]evere shaking, rapid acceleration, deceleration, back and forth movement resulting in bleeding around the brain, bleeding in the back of the eye and swelling of the brain tissue."

8

On cross-examination, Dakil stated that E.P. could not have caused his own injuries, and, when asked if the injuries were inflicted intentionally, she stated, "So the -- the acts that were done, whatever they were, would have been intentional; it wouldn't have been accidental to shake the child. Whether or not the intention was to kill the child, I can't speak to that."[6]

Dusty Seay, a physical evidence specialist with the Longview Police Department,[7] explained that it was her responsibility to go to Mother and Father's trailer to document the scene and to determine if the trailer was a suitable place for a child to live. Seay described the trailer as having a large amount of clutter. The floors, which were reinforced with what she believed to be plywood, "were very weak where you could feel the moisture had -- had weakened [them]." Seay said that she was concerned about the children falling through the floor while playing or jumping. She explained, "It was very weak to the point that we stepped over it rather than on it in that area."

---

[6]By the time trial commenced, Father had been indicted on criminal charges resulting from E.P.'s death. Consequently, he asserted his Fifth Amendment right to remain silent to most questions he was asked. Father refused to answer the following questions:

    (1)      Did you take E.P. to the Longview Hospital on or about October 23, 2020, or on or about October 24, 2020?
    (2)      On or about October 23, 2020, what happened to E.P.?
    (3)      On or about October 23, 2020, were you present when E.P. suffered some type of injury that ultimately led to his death?
    (4)      On or about October 23, 2020, was there a reason why you took E.P. to Longview Regional Hospital instead of taking him to Good Shepherd Hospital?
    (5)      Were you the primary caretaker of your children on October 23, 2020?
    (6)      Were you in the hotel that evening?
    (7)      How many nights did you stay in the hotel?
    (8)      Were you bug bombing your residence on or about October 23, 2020?
    (9)      Have you ever noticed any marks or bruises on the genitals of Z.B.?
    (10)    Did you cause the death of E.P.?

[7]At the time of trial, Seay was a sergeant in training assigned to the patrol division of the Longview Police Department, a SWAT team member, and an instructor for the intermediate crime scene.

The kitchen sink contained several filthy baby bottles, and there was what looked like a dead roach next to the faucet. Seay stated that there were "[r]oaches, other small insects [she was] not familiar with, signs of small brown and black cylindrical fecal matter of insects, and pupal shells from where a fly had hatched." She continued, "There was an unusually large number of mattresses and box springs in the living room and the back bedroom." Because there were bug bombs in the trailer, Seay speculated that the mattresses were standing "up on their side . . . to allow bug bombs to kill the insects, maybe bedbugs." According to Seay, the mattresses were filthy and had a lot of stains on them. "[The mattresses] were not fit for anyone to sleep on. And there were some red stains on them believed to be blood."[8] On cross-examination, Seay was asked if the stains on the mattresses could have been caused by "the dishes in the sink and the litter in the litter box," to which she responded, "Possibly." In Seay's opinion, the home was very unsanitary, and she did not believe that it was a safe environment for the children.

DeGrasse was also responsible for S.P. and Z.B. while the Department looked for a placement home for them.[9] DeGrasse described S.P.'s and Z.B.'s condition, stating, "They were both very dirty, had very dirty clothing on." At one point, Z.B. "indicated" to DeGrasse that he needed to use the bathroom. DeGrasse had been unaware that Z.B., who was around six or seven years old at the time, was still wearing diapers. When Z.B. came out of the bathroom stall,

_____

[8]Seay explained that the Texas Department of Public Safety had done presumptive testing on the mattresses, and the results showed that the stains on the mattresses were blood. Seay conceded that she did not know how the bloody stains got on the mattresses, but she said the stains "were red, some of them bright red which would indicate to [her] they were newer."

[9]At the time of the incident, the children and parents were staying at a hotel. Mother told DeGrasse that they were "bombing their trailer for bugs" and had rented a hotel room for the night.

DeGrasse noticed that he had urinated on his pants. DeGrasse found some clean clothes for Z.B., but when he began to get dressed "it was apparent that . . . his diaper had not been changed in quite a while." She said, "There were different degrees of dried feces on him which indicated to me that he had not been changed or cleaned . . . in a long time."

She also noticed that "there were different colored markings on Z.B.'s genital area. There were different short strokes and then circular patterns that were not visible until his diaper was removed." DeGrasse said she had never seen any other child with similar marks on his genitals and that she was concerned for his safety. Specifically, DeGrasse was concerned that Z.B. had been sexually abused. DeGrasse explained that children who have been sexually abused "exhibit regressive bathroom behaviors such as bedwetting, still wearing diapers, frequent accidents, things like that." She recalled that, when she was changing and cleaning Z.B., "he cried the entire time and pulled away from [her] as if he did not want to be seen or touched, which is also consistent with sexual abuse."

Although E.P. was not the subject of the termination proceeding, there was evidence that S.P. had been in the hotel room at the time E.P. sustained the injuries that resulted in his death. If S.P. actually witnessed the incident, which was, according to the evidence, an intentional act on the part of Father, that would have had a negative impact on S.P.'s emotional well-being. Likewise, Z.B. was not the subject of the termination proceeding, but there was evidence that he had also been subjected to physical mistreatment on an ongoing basis while living in Father's home. Father's intentional or negligent behavior of failing to care for Z.B. would likewise have a negative impact on S.P.'s emotional well-being, if witnessed or known about. Moreover, the

11

Department presented evidence that related directly to S.P. DeGrasse testified that when she had initial contact with S.P. and Z.B., they were both very dirty and were wearing very dirty clothing. Notably, at the time the Department became involved with S.P., she had previously been in the sole care of Father.

As previously mentioned, S.P.'s home environment was clearly substandard.

Moreover, the trial court could consider Father's refusal to answer questions by asserting his Fifth Amendment privilege. "In a civil case, the fact[-]finder may draw reasonable inferences from a party's assertion of the privilege against self-incrimination." *Lozano v. Lozano*, 52 S.W.3d 141, 150 (Tex. 2001). That does not change just because there are pending criminal charges arising out of the same conduct. *Gebhardt v. Gallardo*, 891 S.W.2d 327, 330 (Tex. App.—San Antonio 1995, no writ). Consequently, the trial court was free to draw a negative inference from Father's refusal to answer questions about E.P.'s death or his ability or inability to care for his children.

Considering the entire record, we conclude that the evidence was both legally and factually sufficient to support termination under grounds D and E. As a result, we overrule Father's points of error.

We affirm the judgment of the trial court.

Josh R. Morriss, III
Chief Justice

Date Submitted:     January 3, 2022
Date Decided:      January 26, 2022